CORBETT, Respondent, vs. CHICAGO, ST. PAUL, MINNEAPOLIS & OMAHA RAILWAY COMPANY, Appellant.

*September 11 — September 26, 1893.*

*Carriers: Injury to horses through delay in unloading.*

Where a railroad company, through its freight agent, contracted to carry horses to a point a few miles distant and to unload them the same evening, it is liable for damages resulting from its failure so to unload them, although the conductor of the train on which they were shipped told the shipper, a few minutes before the train started, that he did not think they could be unloaded that night.

Corbett vs. Chicago, St. Paul, Minneapolis & Omaha R. Co.

APPEAL from the Circuit Court for *Douglas* County.

The facts are stated in the opinion. The defendant appeals from a judgment in favor of the plaintiff.

For the appellant there was a brief by *Catlin & Butler* and *Carl C. Pope*, attorneys, and *Thomas Wilson* and *S. L. Perrin*, of counsel, and oral argument by *Mr. Pope*.

*Alexander Athey*, for the respondent.

ORTON, J. The plaintiff substantially alleges in his complaint that the defendant company, on the 5th day of April, 1892, received at Duluth, Minn., sixteen head of draft horses, of the value of $3,500, to be safely and securely conveyed on its cars from Duluth, Minn., to West Superior in this state, and to be delivered to the plaintiff at that place on that same day, to wit, the 5th day of April, 1892, for certain reward to be paid therefor. The defendant company did not safely carry and take care of said horses and deliver the same to the plaintiff at West Superior on that day, and did not deliver the same until the next day, the 6th day of April, whereby the said horses were exposed to inclement weather, and received bruises and wounds, and were greatly injured; and in consequence of the defendant's misconduct the plaintiff was obliged to incur expense in doctoring and caring for the same, to wit, the sum of $30, and has been deprived of their use for thirty days, to his damage of $200, and two of said horses were damaged and permanently injured, to his damage in the sum of $500.

With the general denial, the defendant company answered that it commenced the transportation of the horses on that day, late in the evening, and the defendant's agents informed the plaintiff that said horses would have to remain in the car all night, and could not be unloaded therefrom until the next morning, and that the plaintiff consented and agreed to the said terms and that the said horses should remain in said car over night at West Superior.

The plaintiff, as a witness in his own behalf, testified as follows: On the 5th day of April, 1892, about 4 o'clock P. M., he called upon the freight agent of the defendant at Duluth, at the depot, and told him about trying to get the Northern Pacific Railroad Company to ship said horses to West Superior that day, and unload them there that night, and that company could not ship them that day; and the said agent told him to bring on his stock; they would ship them and unload them if the horses were loaded by 6 o'clock; and they were loaded before that time. The bargain was that they should be unloaded that night. About two minutes before the train started, the conductor told him, "See here! I don't *think* your stock can be unloaded on the other side to-night;" and the plaintiff said, "This is a nice time of day to tell me now." The plaintiff went on the same train with the stock. When the conductor told him he could not unload the horses that night, the car containing the horses was hitched on the train, and the engine attached to the train ready to pull out, and did pull out right away. One Fred. Bitney testified that the plaintiff said to the conductor, if he had known that the horses could not be unloaded that night he would not have loaded them, and the conductor said that "the agent ought to have told you so." The plaintiff testified, further, that he went to the freight office at West Superior about 8 o'clock in the evening of that day, and demanded his stock, and offered to pay the freight. The agent refused the freight, and told him that he could not place the stock that night, on account of there being no switch engine. The stock at that time was out on Hammond avenue, between two bodies of water, and they remained there until about half-past 8 o'clock the next morning, and were unloaded and delivered about 9 o'clock. The plaintiff then testified about the injury and damage to the horses from being left out all night in such a place, and the cost of doctoring them,

and about his loss and damages on account of the injury to the stock, and introduced other testimony on that subject.

The defendant introduced as a witness S. A. Kemp, the freight agent at Duluth, who testified substantially that he told the plaintiff he could not give him a car to West Superior that night, because there were no arrangements for unloading them there at that hour of the night. The plaintiff insisted upon the company's taking the stock, and he then told him he would telegraph and ascertain. He did telegraph, and received a reply that the stock could not be unloaded there. On receiving this reply, about 6 o'clock in the evening, he was not present and knew nothing more about it. The plaintiff loaded the stock without his orders. It was customary for the owner to load the stock when the car was in place. He did not know certainly that the car could not be unloaded that night. He did not offer to unload the stock at Duluth after the receipt of the telegram. A. Conway, a witness for the defendant, testified that he told the plaintiff about seven or eight minutes before the train started that the stock could not be unloaded that night. He knew the time the plaintiff received his shipping bill. F. E. Williams, the freight agent at West Superior, testified that he replied to the telegram that the horses could not be unloaded that night, and he *thought* they could not be for the reason that they had no crew there. He sent the telegram about 6 o'clock. The train arrived at West Superior about 7 o'clock in the evening. The next morning, about 7 or 8 o'clock, the first thing the engine did was to go up and get the car and bring it down, and it was unloaded.

The plaintiff, recalled, testified that Kemp never told him the car could not be unloaded that night, or that he would telegraph to find out. The first time any one said it could not be unloaded that night was the conductor and

the yardmaster, and that was just as the train was starting.

On this evidence and the instructions of the court, the jury found a verdict for the plaintiff of $500.

The above is substantially all the testimony material to the case, except that to prove the damages.

The case is almost exclusively one of fact. The law of the case is too plain for argument.

Whether there was a contract entered into, and what it was, depends upon the testimony of the plaintiff and Kemp, the freight agent, alone, and on these questions there is a conflict and direct contradiction. In such a case the jury had the right to believe one or the other. The question of the credibility of the witnesses is peculiarly within the province of the jury. According to the testimony of the plaintiff, he contracted with Kemp, the freight agent, that the defendant should transport his sixteen head of horses in its cars to West Superior in the evening of the 5th day of April, 1892, and deliver them to him that night at their destination. This was at about 4 or 5 o'clock, and the train was to leave at 6 o'clock that evening. He hurried to find a car and load the horses in it, and the car was at once placed in the train, and the train was hauled up ready for a start, and he had received his freight bill for the horses to be so carried. Only two or three minutes before the train started the conductor told him that they could not unload the horses that night, and he said, "This is a nice time to tell me now," and the train went on its way and the plaintiff with it. When the train arrived at West Superior, about 7 or 8 o'clock in the evening, it passed directly by the freight depot, and the car was left a considerable distance away, between two bodies of water, until the next morning about 8 o'clock. The plaintiff, after the train arrived at West Superior, went to the freight office, demanded his horses, and tendered the freight. His horses

were greatly injured by standing in the car where it was left all night, in inclement weather.

This is the plaintiff's case. The testimony for the defendant conflicts with this case only in two particulars: (1) That of Kemp, that no such contract was made about unloading the horses that night, and that he said he would telegraph to ascertain, etc.; (2) other witnesses testified that it was seven or eight minutes, instead of two or three, before the train started that the plaintiff was informed that the horses could not be unloaded at West Superior that night, which is certainly quite immaterial. According to the plaintiff's testimony, there was a perfect contract to deliver the horses that night. On that contract they were loaded on the car, and the car placed in the train, and billed by the freight agent, and the train was ready to start when he received the casual information that they would not be unloaded that night, and he paid no attention to it, and the train went on. Does this last fact change or affect the contract? It does not appear that the conductor or yardmaster had any authority to change the contract made with the freight agent. The plaintiff depended upon his contract, as he had the right to do. These persons did not pretend to know that the horses could not be unloaded that night, and there was no evidence whatever that they could not have been unloaded that night as well as the next morning. There is no evidence that it was impossible. It was clearly a mere matter of convenience. To allow such testimony to change or vary a perfect and valid contract, on which the very safety and security of this live freight depended, would be trifling. The plaintiff well said that he would not have shipped the horses if he had known they could not be unloaded that night. He did not know that they could not be so unloaded, and never knew it. The *pretext* that the defendant company, with all of its men, machinery, and vast railroad facilities at West Supe-

rior, could not unload sixteen valuable horses from a freight car, on their arrival, and was compelled by invincible necessity to leave the car with its perishable freight in a distant, dangerous, and inaccessible place, exposed to wind and weather, at an inclement season of the year, through the whole night, was not sustained by any proof whatever, and it would require a large amount of the most reliable evidence to make it credible.

There was really no defense whatever to the case made by the plaintiff's testimony. The case is a perfect one of a valid contract and its violation by the defendant to the damage of the plaintiff, and there is not a place in it for difficult or complicated questions of law on the rescission of contracts or on contracts of impossible performance. The case is too plain for argument or the citation of authorities.

There are exceptions to a large part of the charge of the court by the defendant's counsel. The instructions appear to be very full and fair, and to state the law of the case correctly. The court, in effect, instructed the jury that if they believed the witness Kemp, and not the plaintiff, the defendant was entitled to a verdict; but if they believed the plaintiff, and not the witness Kemp, the plaintiff ought to recover. There was perhaps too much said about the plaintiff taking his horses out of the car when informed that they could not be unloaded that night. He was not bound to unload his horses by any such casual talk of the conductor. The conductor did not pretend to *know* that they could not be unloaded that night. It was mere hearsay by telegraph, and the freight agent at West Superior said only that he "*thought*" they could not be unloaded, because there was no crew there. It needed no " crew " to unload the horses. If the car had been stopped or left in a proper place, the plaintiff could have unloaded them as he loaded them on the car himself. It was the

duty of the company to provide the means for unloading the horses at the proper time and place, rather than expose such freight to destruction or great injury by its inexcusable negligence.

The learned counsel of the appellant do not point out the particulars in which the damages are excessive, and they do not appear to be so, but warranted by the evidence.

The verdict appears to be just, and supported by the evidence, and there is no error in the record.

*By the Court.*— The judgment of the circuit court is affirmed.